RICHLAND COUNTY, OHIO
07/28/2026 03:46 PM
HEIDI EWING
CLERK OF COURTS
2026 CV 0541
NAUMOFF, JUDGE PHILLIP S

**IN THE COURT OF COMMON PLEAS**
**RICHLAND COUNTY, OHIO**
**CIVIL DIVISION**

| | | |
|---|---|---|
| XENIOS, LLC a New York Limited Liability Company<br>277 Alexander Street, Suite 410<br>Rochester, NY 14607<br><br>Plaintiff, | : | Case No.:<br><br>Judge:<br><br>JURY TRIAL DEMANDED |
| v. | : | |
| POS SOLUTIONS, LLC d/b/a INTEGRITY POS, a Kansas Limited Liability Company<br>16250 Foster Street<br>Stilwell, KS 66085<br><br>KING CONSULTING, INC., a Kansas Corporation<br>6770 W 187th Street,<br>Stilwell, KS 66085<br><br>JOEY KING, an individual<br>25575 Metcalf Rd.<br>Louisburg, KS 66053<br><br>Defendants. | : | |

**COMPLAINT**

COMES NOW Xenios, LLC ("Plaintiff" or "Xenios"), by and through the undersigned counsel, and for its Complaint against Defendants POS Solutions, LLC d/b/a Integrity POS

EXHIBIT
1

("Integrity"); King Consulting Inc. ("King Consulting"); and Joey King ("King") (collectively, the "Defendants") alleges and states as follows:

**NATURE OF THE ACTION**

1. Plaintiff is seeking monetary damages in excess of $15,000 for Defendants' interference with contracts between Plaintiff and various merchants, diverting various merchants away from Plaintiff's software and point-of-sale systems, and ruining the goodwill and reputation of Plaintiff's business.
2. Plaintiff sets forth claims for (1) breach of contract; (2) tortious interference with a contract and business relations; (3) injunctive relief; (4) unjust enrichment in the alternative; (5) misappropriation of trade secrets/confidential information and unfair competition; (6) conversion; (7) indemnification; and (8) piercing the corporate veil.

**THE PARTIES**

3. Plaintiff Xenios, LLC is a limited liability company formed under the laws of the State of New York with a principal place of business in Rochester, New York. Xenios is a single member LLC, with the member being another LLC with four members that are natural persons.
4. Defendant POS Solutions, LLC d/b/a Integrity POS is a limited liability company with a principal place of business in Stilwell, Kansas. King Consulting is the sole member of POS Solutions, LLC.
5. Defendant King Consulting Inc. is a Kansas Corporation with a principal place of business in Stilwell, Kansas. King Consulting is the sole member and owner of POS Solutions, LLC. Upon information and belief, Joey King and Brooke King are members of King Consulting.
6. Defendant Joey King is the owner and managing member of King Consulting Inc.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Article IV, Section 4(B) of the Ohio Constitution, which provides that the courts of common pleas have original jurisdiction over all justiciable matters. Further, R. C. 2305.01 states that the court of common pleas has original jurisdiction in all civil cases in which the sum or matter in dispute exceeds the exclusive original jurisdiction of county courts, which is more than $15,000.

8. This Court has personal jurisdiction over the Defendants acting directly and/or by an agent, pursuant to R.C. 2307.382 where Defendants contracted to supply services or goods in the state. Further, the Dealer Agreement's governing law provision states "the Agreement shall be construed with the laws of the state of Ohio…" Dealer Agreement, ¶27. A copy of the Dealer Agreement is attached as **Exhibit A**. The parties to the Dealer Agreement "hereby irrevocably commit to the jurisdiction and venue of such courts…" *Id*.

9. Venue is proper in Richland County, Ohio pursuant to the forum selection clause of the Dealer Agreement, binding the parties to Richland County. By consenting to Richland County, the parties agreed to "waive any claims of *forum non conveniens* or other causes for change of venue." *Id*.

## FACTUAL ALLEGATIONS

### A. Xenios' Business "2TouchPOS"

10. Xenios and Integrity are in the merchant services industry. Xenios retails a point-of-sale system marketed to bars, night clubs and restaurants named "2TouchPOS".

11. Digital payment systems require various software and middleware, such as Plaintiff's, to connect merchants to payment processing gateways necessary to facilitate credit card transactions.

12. 2TouchPOS products provide merchants with integrated access to these digital financial networks and runs proprietary software that is exclusive to the 2TouchPOS system.

13. The 2TouchPOS system allows businesses to track inventory, manage customer transactions, process payments, connect to credit card processing gateways, and more.

14. Xenios owns 100% of the 2TouchPOS intellectual property, including the software.

**B. The Dealer Agreement**

15. On October 1, 2010, Defendant King executed a Dealer Agreement on behalf of POS Solutions, LLC, doing business as Integrity POS ("Integrity") as principal and owner of Integrity with Xenios.

16. Defendant Integrity is an independent sales organization selling POS systems and payment processing solutions along with installation and customer support.

17. Upon information and belief, King Consulting, Inc. is the sole member and owner of Integrity.

18. Upon information and belief, Joey King and Brooke King are members of King Consulting, Inc. and Defendant Joey King is the owner and managing member of King Consulting Inc.

19. Joey King unilaterally controlled all decisions and actions of Integrity.

20. Upon information and belief, Joey King did not observe corporate formalities but instead conducted business through Integrity as his alter ego.

21. Joey King abused corporate powers in causing Integrity to take the unlawful actions described herein.

22. Joey King directly participated in the unlawful actions described herein.

23. Under the terms of the Agreement, King and Integrity are dealers, who agreed to resell 2TouchPOS products to various merchants within the night club, bar and restaurant space.

24. Since 2015, Integrity has remained the sole authorized dealer of Plaintiff Xenios' "2TouchPos" software products, including software licensing, in the Territory specified in the Dealer Agreement, placing a great deal of trust in the Defendants and agreeing to terminate its dealer program nationwide, save for Integrity. *See* **Exhibit A** at Schedule B – Territory at p. 8.

**C. The Dealer Agreement Terms**

25. Defendants agreed to perform various duties in accordance with the Dealer Agreement, including, provide hardware maintenance assistance for Plaintiff's products, notify Plaintiff of any threatened or actual legal action against Plaintiff or Defendants, comply with all applicable laws and regulations, obtain any licenses or permits pertaining to shipment of equipment, and reselling Plaintiff's products and services in accordance with the terms of the Agreement. *See* **Exhibit A** ¶4.

26. The Agreement further provides that Defendants agreed "to maintain the highest reputation for fair and ethical dealing with each other and with customers in the promotion of [Plaintiff's] products." *See* **Exhibit A** ¶2(b).

27. Further, Defendants agreed not to disclose Confidential and Proprietary Information without the written consent of Plaintiff and agreed to protect and secure Confidential Information with the same degree of care and confidentiality that it employs to protect its own proprietary and/or confidential information. *See* **Exhibit A** ¶15.

28. The Dealer Agreement defines Proprietary Information and Confidential Information broadly, including ideas and concepts relating to equipment, software, marketing, implementation, designs, patents, trade secrets, plans, specifications, copyrights, service marks, trademarks, source code, object code, marketing plans, and information the Plaintiff otherwise intends to be confidential. *See* **Exhibit A** ¶1.2 and 1.12. Section 33 of the Dealer Agreement allows either party to seek injunctive relief for breaches or threats of breach of any of the covenants expressed within the Dealer Agreement. *See* Exhibit A ¶33.

29. The Dealer Agreement also sets forth provisions related to indemnification stating, Defendants "will indemnify, defend and hold each other harmless from any and all liabilities, losses, obligations, expenses (including without limitation to attorney's fees) and costs arising in connection with any lawsuit, proceedings, or other action (i) arising out of the operation of the other's business or (ii) related to any claim by a third party based, in whole or in part, on [Defendants'] distribution, use, or installation of Products. The activities of any of [Defendants'] employees, agents of representatives will be considered activities of the [Defendants'] for purposes of this Section. Either party will have the right, but not the obligation, to assume the defense of any such lawsuit, proceeding, or action. [Plaintiff] and [Defendants] will each give the other prompt notice of any such claim, lawsuit, proceeding or action." *See* **Exhibit A** ¶20.

30. Given the relationship between the parties, Plaintiff trusted Defendant King and his company Integrity to conduct themselves in a reasonable commercial manner and protect the business interests and reputation of 2TouchPOS products.

**D. Discovery of Defendants' Scheme**

31. Over the course of the relationship between Plaintiff and Defendants, Plaintiff amassed a portfolio of merchants that Plaintiff did not want to sell to Defendants.

32. The portfolio of merchants included those also in the payments industry.

33. Xenios's contracts with other merchants involve trade secrets and confidential information including, computer programs, software, applications and intellectual property exclusive to Xenios.

34. Due to Plaintiff refusing to sell his portfolio, King began telling Xenios' customers not to contact Xenios.

35. Plaintiff became aware that King and Integrity were attempting to move Plaintiff's merchants to a new point-of-sales system in violation of King and Integrity's Dealer Agreement with Xenios. *See* **Exhibit A** at ¶35.

36. Defendants have interfered with existing contracts between Plaintiff and various merchants by diverting business away from Plaintiff's system and software.

37. Defendants have ruined Plaintiff's goodwill and reputation.

**<u>COUNT I – BREACH OF CONTRACT</u>**
**(Against All Defendants)**

38. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.

39. The Dealer Agreement is a valid, enforceable contract supported by consideration, including a $2,295 dealer fee and mutual covenants. *See* **Exhibit A**.

40. Plaintiff fully performed all aspects of the Agreement.

41. Plaintiff became aware that King and Integrity diverted Xenios' merchants over to a new point-of-sales system.

42. Defendants further asked Plaintiffs' merchants not to talk to Plaintiff, in effect severing agreements between Plaintiffs and merchants.

43. Defendants breached the Agreement by failing to maintain fair and ethical dealing in the promotion of Plaintiff's products with Plaintiff's merchants. *See* **Exhibit A** ¶2(b).

44. Defendants' actions damaged Plaintiffs' goodwill, brand and reputation in addition to other monetary damages due to the loss of various merchant contracts.

**COUNT II – TORTIOUS INTERFERENCE WITH A CONTRACT AND BUSINESS RELATIONS**
**(Against All Defendants)**

45. Plaintiff incorporates by reference the preceding allegations as if fully written herein.

46. Plaintiff had existing contractual and business relationships with various merchants through King and Integrity's marketing efforts.

47. The portfolio of merchants included those also in the payments industry.

48. Xenios's contracts with other merchants involve trade secrets and confidential information including computer programs, software, applications and intellectual property exclusive to Xenios.

49. Given King and Integrity's involvement and efforts securing these contracts with other merchants, Defendants knew or should have known of the contractual relationships between Plaintiff and those various merchants.

50. Defendants intentionally and without privilege or justification interfered with Plaintiff's contractual and business relationships by soliciting Plaintiff's existing merchants without permission, misusing confidential information to divert sales or services, disrupting commissions or accounts, causing breach, termination, or loss of expectancy between Plaintiff and various merchants.

51. Plaintiff suffered damages proximately caused by Defendants' interference, including lost sales, lost profits, diminution of goodwill, harm to reputation and other consequential damages to be proven at trial, and ongoing and irreparable harm absent injunctive relief.

**COUNT III – INJUNCTIVE RELIEF**
**(Against All Defendants)**

52. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.

53. Section 33 of the Dealer Agreement allows either party to seek injunctive relief. *See* **Exhibit A** ¶33.

54. Plaintiff is likely to succeed on the merits of its breach of contract and interference claims as Defendant intentionally and with justification diverted various merchants away from Plaintiff's systems and software knowing a contract existed between those merchants and Plaintiff.

55. Plaintiff will suffer irreparable harm in the absence of injunctive relief, such that Plaintiff will be deprived of the benefits from its contractual agreements with various merchants Defendants continue to divert from Plaintiff.

56. Plaintiff requests injunctive relief that includes, without limitation:

    a. Enjoining Defendants from unauthorized use or disclosure of Plaintiff's Confidential or Proprietary Information as defined in the Agreement;

    b. Enjoining unauthorized use of Plaintiff's Trademarks, trade names, or service marks;

    c. Enjoining interference with Plaintiff's accounts, including Dealer-enrolled accounts consistent with Section 24.4 of the Dealer Agreement; *See* **Exhibit A**

    d. Requiring compliance with the Dealer Agreement's post-termination obligations; and

e. Any other narrowly tailored relief to prevent ongoing or threatened harm.

**<u>COUNT IV – UNJUST ENRICHMENT (in the alternative)</u>**
**(Against All Defendants)**

57. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.

58. In the alternative, through Defendants' efforts in diverting various merchants away from Plaintiff's systems and software to another point-of-sale system, Defendants have been unjustly enriched by retaining benefits that otherwise would have belonged to Plaintiff.

59. Equity and good conscience require restitution to Plaintiff in an amount corresponding to the value of the benefits conferred and wrongfully retained by Defendants.

**<u>COUNT V – MISAPPROPRIATION OF TRADE SECRETS/CONFIDENTIAL INFORMATION PURSUANT TO OHIO UNIFORM TRADE SECRETS ACT ("OUTSA"), R.C. §§1333.61-1333.69</u>**
**(Against All Defendants)**

60. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.

61. Pursuant to the Ohio Uniform Trade Secrets Act ("OUTSA"), R.C. 1333.61 *et seq.*, a trade secret is "information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers…" that either derives economic value from not being generally known or ascertainable by proper means or it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. R.C. 1333.61(D).

62. A trade secret is misappropriated when the trade secret is known to be acquired by improper means, or when it is disclosed or used without express or implied consent. R.C. 1333.61(B).

63. The Dealer Agreement restricted the use and disclosure of Plaintiff's Confidential and Proprietary Information including ideas and concepts related to its equipment, software marketing, patents and other intellectual property. *See* **Exhibit A** ¶¶1.2, 1.5 and 1.12.

64. Defendants misused, threatened to misuse, or wrongfully retained Plaintiff's Proprietary and Confidential Information to compete unfairly, divert business, and/or interfere with Plaintiff's merchant contractual relationships, causing and threatening irreparable harm and damages to Plaintiff.

65. Plaintiff seeks injunctive relief to prevent further misuse or disclosure of Proprietary and Confidential Information, as well as damages measured by, inter alia, Plaintiff's losses, Defendants' unjust gains, and corrective measures necessary to remediate the effects of the misappropriation and unfair competition. *See* **Exhibit A** ¶33.

**Count VI— CONVERSION**
**(Against All Defendants)**

58. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.

59. Through their efforts to divert business from Plaintiff, Defendants wrongfully exercised dominion or control over Plaintiff's property, including confidential documents, proprietary materials, trademark-bearing marketing materials, merchant data, or payments/commissions due, in exclusion of Plaintiff's rights, without authorization, and inconsistent with Plaintiff's superior rights under the Dealer Agreement.

60. Plaintiff has suffered damages and is entitled to recovery of the converted property or its value, together with consequential damages and appropriate equitable relief to prevent further wrongful control or use.

**COUNT VII – INDEMNIFICATION**
**(Against All Defendants)**

61. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.
62. Defendant agreed to indemnify Plaintiff for any losses or claims arising out of Plaintiff or Defendants business and, further, Plaintiff is entitled to recover reasonable attorneys' fees and costs.

**COUNT VIII – TO PIERCE THE CORPORATE VEIL AS TO INTEGRITY, KING CONSULTING INC., AND JOEY KING**

63. Plaintiff incorporates by reference the preceding allegations as if fully rewritten herein.
64. Upon information and belief, Defendant Joey King is the managing member and owner of Defendant King Consulting Inc., which is the managing member and owner of Integrity.
65. Plaintiff became aware that King and Integrity were attempting to move Plaintiff's merchants to a new point-of-sales system.
66. Defendant King used Integrity to promote a fraud of injustice against Xenios by diverting business away from Plaintiff.
67. Defendants have interfered with existing contracts between Plaintiff and various merchants by diverting business away from Plaintiff's system and software.
68. It would be unjust to permit Defendant King to avail himself of the protection of the corporate form.
69. The corporate veil should be pierced as to all Defendants.

**WHEREFORE**, Plaintiff Xenios, LLC demands judgment in its favor on all causes of action against Defendants, POS Solutions, LLC d/b/a Integrity POS; King Consulting Inc. and Joey King in an amount to be proven at trial, including injunctive relief, consequential damages,

plus reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ *Margaret S. Echols*
Andrew P. Guran (0090649)
VORYS, SATER, SEYMOUR AND PEASE LLP
50 South Main Street, Suite 1200
Akron, OH 44308
T / F: (330) 208-1143
Email: apguran@vorys.com

Margaret S. Echols (0099471)
VORYS, SATER, SEYMOUR AND PEASE LLP
200 Public Square, Suite 1400
Cleveland, Ohio 44114
T / F: (216) 479-6100
Email: msechols@vorys.com

Federica Caloia (*pro hac vice forthcoming*)
GRIFFIN PARTNERS LLP
1500 Walnut Street, Suite 1700
Philadelphia, PA 19102
T / F: (267) 313-0766
federica@griffinpartners.us

*Attorneys for Plaintiff Xenios, LLC*

**CERTIFICATION OF ARTIFICIAL INTELLIGENCE ASSISTANCE**

I, the undersigned attorney, hereby certify the following regarding Plaintiff Xenios, LLC's Complaint:

1. Counsel completed the legal research and analysis reflected in the Complaint.
2. Counsel applied artificial intelligence ("AI") technology through WestLaw to assist with legal research and drafting the complaint.
3. Counsel prepared the citations to legal authority and verified those citations.
4. Counsel checked for accuracy all legal citations before filing this Complaint with the Court.
5. Counsel conducted a final review and approval of the AI-assisted material before filing this Complaint with the Court.

*/s/ Federica Caloia*
Federica Caloia (*pro hac vice forthcoming*)

*One of the Attorneys for Plaintiff Xenios, LLC*

# EXHIBIT A

**2TouchPOS**

**Dealer Agreement**

THIS AGREEMENT is made this 1 day of Oct, 2010 by and between Xenios, LLC a New York Corporation with its principal place of business at 277 Alexander Street, Suite 410, Rochester NY 14607 (hereinafter referred to as "Company") and POS Solutions LLC DBA Integrity POS
With its principal place of business at:
12223 W 87th Street Parkway Lenexa KS 66215
(Hereafter referred to as "Dealer").

**BACKGROUND**

The Company is engaged in the development, marketing and distribution of 2Touch$^{POS}$, a point-of-sale system and several associated applications. Dealer has requested the right to resell such Products to its customers IN CONSIDERATION of the promises, the mutual covenants of the parties, $2295.00 Dealer Fee and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, Company and Dealer hereby agree as follows:

**1. Definitions**

The following words shall have the following meanings when used in this Agreement:

1.1 "Prices" shall mean Company's then-current prices for Products as may be provided by Company to Dealer and its customers, and as initially set forth in Company's price List.

1.2 "Proprietary Information" shall mean all ideas and concepts relating to Company's equipment, computer software, marketing, implementation and designs for Company's software, and other technologies including, without limitation, patents, trade secrets, plans, specifications, copyrights, service marks, trademarks, source code, object code and marketing plans.

1.3 "Purchase Order" shall mean any document received by the Company from Dealer contracting, or promising to purchase 2Touch$^{POS}$ components.

1.4 "Services" shall mean any services provided by Company or Dealer to customers under this Agreement including, without limitation, installation and support services as well as maintenance services.

1.5 "Equipment" shall mean any 2Touch$^{POS}$ equipment and software as described in Company's price list.

1.6 "Terms and Conditions" shall mean Company's terms and conditions that include Company's lease and finance programs.

1.7 "Products" shall mean Equipment, Software and systems incorporating Equipment and/or Software and Services provided or to be provided by the Company.

1.8 "Software" shall mean computer software products intended by Company for resale by Dealer, which may be supplemented or amended at any time by Company upon written notice to Dealer.

1.9 "Territory" shall mean the primary sales area identified on Schedule B attached hereto and incorporated for all purposes.

1.10 "Trademarks" shall mean the trademarks, service marks, and trade names 2Touch$^{POS}$, which Dealer hereby acknowledges are the property of Company.

1.11 "Training" shall mean the educational training programs provided by Company to Dealer and Dealer's personnel to allow Dealer to sell, install, and maintain the 2Touch$^{POS}$ software and equipment.

1.12 "Confidential Information" shall mean any information which is marked as "Confidential" or "Proprietary" by Company or otherwise intended by the Company to be maintained as confidential. The content or nature of the information shall not under any circumstance be deemed an indicator that such information shall not be considered confidential. Company and Company alone is the determining party as to the confidentiality of any information generated by Company.

1.13 "Dealer Status" shall be defined by the levels identified on Schedule D attached hereto and incorporated for all purposes.

**2. Appointment**

Subject to the terms herein, Company hereby grants Dealer the right to market and sell the Products in the Territory as described in Schedule B of this Agreement. To induce Company to enter into this Agreement, Dealer represents and warrants to Company that Dealer is:

a) Willing to obtain sufficient knowledge in the Products and maintain the level of knowledge necessary to sell and support Products;

b) Willing to maintain the highest reputation for fair and ethical dealing with each other and with customers in the promotion of Company Products

c) Willing to not assign any of its rights or obligations under this agreement without the prior written consent of Company

d) Willing to not sell Products or services to existing Company customers without prior express written permission of Company.

**3. Acceptance of Appointment**

Dealer hereby accepts appointment as a Dealer of the Products on the terms and conditions provided for in this Agreement.

**4. Duties of Dealer**

In satisfaction of its duties under this Agreement, Dealer shall undertake the following duties in a professional manner to the satisfaction of Company:

4.1 Provide hardware maintenance assistance for Company's Products;

4.2 Notify Company immediately of any threatened or any actual legal action against Company or Dealer regarding the Products;

4.3 Comply with all applicable international, territorial, federal, provincial, and local laws, ordinances, and regulations in connection with Dealer's performance of this Agreement.

4.4 Obtain all licenses, permits, government approvals, customs duties, and any and all other licenses pertaining to shipment of equipment to, and services in the Territory; and

4.5 Resell Company's products and services, in accordance with the definition found in Article 1.7; No license, right or interest in any Company trademark, trade name or service marks is granted herein, except as expressly provided for below. Except as provided in Section 21, neither Dealer nor any of Dealer's customers may use any Company trademark, trade name or service mark without Company's prior written consent. Dealer shall secure the execution of documents and instruments required by the Company with respect to such resale or licensing of the Products.

**5. Prices**

Dealer customers and or Dealer shall pay Company the prices for the Products purchased under this Agreement as set forth in the Company-Published Price List.

5.1 All prices may be amended by Company in its sole discretion from time to time.

5.2 All such changes shall become effective thirty (30) days after Dealer has received written notice from Company. New Products, when released, will be sold to Dealer or dealer customers at Company's then existing price.

**6. Purchase Orders**

Dealer or Dealers customers may initiate purchase of the Products by submitting a Purchase Order through their Sales Representative. All Purchase Orders shall be in writing in a form acceptable to Company. All Purchase Orders must be accepted in writing by Company and are not valid or effective until accepted by Company. Company reserves the right to reject any Purchase Order. In the event any Purchase Order contains terms, which are in addition to or in conflict with the terms of this Agreement, or the Terms or Conditions, the Terms and Conditions of this agreement shall apply. After acceptance of a Purchase Order Company shall deliver to a common carrier F.O.B. Company facilities. Dealer and Dealer customers assumes all risks of loss or damage upon delivery of the Equipment to Dealer's customers shipping destination. Dealer agrees that acceptance of Equipment shall occur upon delivery of the Equipment by the Company to Dealer or a common carrier.

**7. Payment**

Unless Dealer or Dealer's customer is approved for credit with Company, Dealer or Dealer's customer shall deliver 100% payment for all purchases to the Company prior to shipment of the applicable order. Credit will be granted to Dealer's customers on a case-by-case basis, initiated with Dealer's customer's application for credit by submission of the Company's form of credit application. The amount and term of credit extended to Dealer's customer, if any, shall be at the discretion of the Company and is subject to change, as the Company may deem appropriate.

**8. Delivery of Order**

After Company has accepted the Purchase Order, the Company will use reasonable efforts to fulfill any orders received from Dealer customers within 10 calendar days. Company shall have no duty or obligation to deliver any Products if Dealer is in breach or default of this Agreement or any past due amount is owed by Dealer's customer to Company.

**9. Terms**

The Agreement will commence upon signature by both parties and will have an initial term of twelve (12) months. Thereafter, it will be automatically renewed for additional twelve-month periods unless either party provides 30 days' prior written notice to the other of its intention to terminate this Agreement. Both the initial term and any subsequent renewal periods are subject to termination in accordance with the provisions of Section 23 ("Termination").

9.1 Company and Dealer agree that throughout the term of this agreement the parties will act in a fair, equitable and ethical manner to each other as well as the end user.

9.2 Company may contact Dealer's customers without prior consent from Dealer.

9.3 If Dealer customer contacts Company directly then Company will notify Dealer and work with Dealer to resolve the situation.

**10. Marketing**

Promotional material and advertisements or any material to be released to the public, including photographs that utilize any trademarks of the Company or depict any of the Products shall be approved by an authorized executive officer of the Company in writing prior to its public release.

**11. Reporting and Forecasting**

Dealer and Company will meet at mutually agreeable times to review Dealer-forecasted purchases each quarter. These meetings will be conducted via telephone or email unless other arrangements are required. In such an event, each party shall bear its own expenses to attend the meeting.

**11a. Demonstration Unit**

Dealer shall receive 1 Posiflex All-In-One touch screen terminal with Demo case loaded with the most current version of 2Touch. 2Touch will include demonstration databases for:

1. Night Club
2. Pizza Shop
3. Coffee Shop
4. Bar and Grille

NO Unit Plan

**12. Training, Installation and Support Services**

Dealer shall assist with Product installation, Go-Live Support and hardware maintenance in accordance with their dealer status as defined in Schedule D. Dealer and Company understand and agree that initial training of Dealer's personnel will be provided by the Company on a chargeable basis and on Company's premises. Dealer will be responsible for travel expenses. Dealer agrees that all installations are to follow the implementation guidelines as called out in the 2Touch set up workbook.

12.1 Company will provide training material, technical documentation and support as deemed appropriate by the Company to familiarize Dealer with the installation of the systems;

12.2 Company will provide training, subject to availability of Company resources, on a chargeable basis to Dealer personnel at one of Company's facilities when reasonably requested by the Dealer. Dealer will bear the expenses of this training.

12.3 Subsequent to Dealer's receipt of relevant training outlined herein, the Dealer will respond in a timely and effective manner to all inquiries of Product customers concerning the operation of any Products. Company agrees to technical phone support for Dealer's customers on any technical or operational issues that are covered by an active support agreement.

12.4 Company will provide a list of validated hardware that is supported for use with 2Touch[POS] any hardware not on this list is unsupported. Dealer agrees to only provide validated hardware.

**13. Documentation**

13.1 Company agrees to provide one copy of each relevant user's manual without charge. Amended documentation will be provided to Dealer, as is necessary and appropriate for the installation and maintenance of customers' equipment. Additional copies of such manuals will be furnished at Company's then existing price. To the extent that such other information (including price, data/documentation and marketing information) furnished to Dealer is.

Confidential Information, the Dealer agrees to keep it in strictest confidence and not to disclose the confidential information.

13.2 Dealer shall not make any change to any documents or manuals provided by Company to Dealer.

**14. Equipment Service**

14.1 Repairs under Warranty. All repairs of the equipment made under warranty shall be made or authorized by the Company under the standard warranty for the applicable Product, as provided by the Company or a third party provider of the applicable Product.

14.2 Repairs outside of Warranty. Dealer may repair Equipment using Company standards and using only Company authorized repair parts and procedures. If Company deems that repairs or modifications to Equipment were made outside of Company-approved guidelines; all warranties on the applicable Equipment will become immediately void. Such repairs will not indicate any extension of the Product warranty by the Company.

**15. Confidential Information**

15.1 Dealer, its employees and agents shall retain all Confidential Information, as defined in Article 1 and to prevent disclosure of such Confidential Information, except as expressly provided for in this Section 15.1. Company hereby states that the Product designs constitute a valuable asset of Company, and are to be considered Proprietary Information. Access by Dealer to Confidential Information shall be restricted to Dealer's employees with a need to have access to such Confidential Information, each of whom shall have signed a confidentiality agreement containing protections benefiting the Company and no less restrictive than the provisions of this Section 15. Dealer acknowledges that by virtue of this Agreement, Dealer acquires only the right to use the Confidential Information under the terms and conditions of this Agreement for so long as it is in effect, and does not acquire any rights of ownership, title, or disclosure of the Confidential Information.

15.2 Dealer shall not use, make, have made, distribute or disclose any copies of the Confidential Information, in whole or in part, without the prior written authorization of Company except as defined herein.

15.3 Dealer shall inform its employees having access to the Confidential Information of Dealer's limitations, duties and obligations regarding nondisclosure and copying of the Confidential Information. Dealer agrees to protect and secure the Confidential Information with the same degree of care and confidentiality that it employs to protect its own proprietary and/or confidential information.

**16. Warranties**

16.1 Unless otherwise specified by the Company, Products developed by the Company are delivered with a warranty for (30 Days). Products supplied by third parties are subject to the applicable warranties provided by such third parties, and the Company makes no additional warranties with respect to such Products.

16.2 Dealer shall in no way imply or state to its customers that any warranties not expressly given by the Company or applicable third parties are in effect with respect to the Products.

16.3 Products suspected to be deficient may be delivered to Company, which will, as its sole obligation hereunder and at its option, replace or repair Products that the Company finds to be deficient. In the case of shipments related to warranty actions, Company will bear shipping costs for shipments to Dealer, and Dealer will bear shipping costs for shipments to Company. The party bearing shipping costs has exclusive choice of the method of shipping. A RMA # is required on all returns.

**17. Limitation of Liability**

17.1 **COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES (EXCEPT AS STATED ABOVE) INCLUDING, BUT NOT LIMITED TO, THE WARRANTIES OF DESIGN, MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE.**

17.2 **IN NO EVENT WILL COMPANY BE LIABLE FOR ANY LOST REVENUES OR PROFITS, OR OTHER SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

17.3 **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S MAXIMUM LIABILITY FOR DAMAGES SHALL BE LIMITED TO THE PAYMENTS MADE BY DEALER UNDER THIS AGREEMENT FOR THE SPECIFIC PRODUCT THAT CAUSED THE ALLEGED DAMAGES.**

**18. Limitation of Intellectual Property Liability**

18.1 The Company shall have no liability for any claim of copyright, trade secret or patent infringement based on the use of the Products or the use or combination of the Products and equipment, services or other materials not provided by Company.

18.2 **THE COMPANY SHALL HAVE NO LIABLITY WITH RESPECT TO ANY ALLEGED OR PROVEN INFRINGEMENT OF PATENTS, TRADE SECRETS AND COPYRIGHTS WITH RESPECT TO THE PRODUCTS OR ANY PARTS THEREOF.**

**19. Disclaimer of Partnership or Agency**

The relationship between Company and Dealer under this Agreement is solely that of independent contractors. Each of the parties is in no way the legal representative or agent of the other party for any purpose, shall not in any way hold themselves out as such, and shall have no power to assume or create, in writing or otherwise, any obligation or responsibility of any kind, expressed or implied, in the name of or on behalf of the other party.

**20. Indemnification**

Both parties will indemnify, defend and hold each other harmless from any and all liabilities, losses, obligations, expenses (including without limitation to attorney's fees) and costs arising in connection with any lawsuit, proceedings, or other action (i) arising out of the operation of the other's business or (ii) related to any claim by a third party based, in whole or in part, on Dealer's distribution, use, or installation of Products. The activities of any of Dealer's employees, agents of representatives will be considered activities of the Dealer for purposes of this Section. Either party will have the right, but not the obligation, to assume the defense of any such lawsuit, proceeding, or action. Company and Dealer will each give the other prompt notice of any such claim, lawsuit, proceeding or action.

**21. Use of Company Trademarks and Service Marks**

21.1 During the term of this Agreement, Dealer shall have a limited license to use the Trademarks in connection with Dealer's promotion of the Products, but only in strict compliance with such license and the policies, instructions and guidelines of Company. This compliance shall include proper display of trademark notices and warnings with each use of trademark and any use of such Trademarks shall be subject to prior approval of the Company;

21.2 Dealer acknowledges the exclusive right, title and interest of the Company in and to the Trademarks;

21.3 Nothing contained in this Agreement shall be construed as conveying to Dealer any right, title of interest in or to any of the Trademarks other than an express right to a permissive use thereof in connection with the promotion of the Products;

21.4 Dealer shall cooperate to the fullest extent possible with Company or its nominee to take such actions, as Company in its sole discretion may consider necessary to protect any of the Trademarks;

21.5 Dealer shall fully cooperate with Company in maintaining and defending the ownership and validity of each of the Trademarks against infringement and claims of infringement, Dealer will promptly notify Company of (i) any infringement or unauthorized use of any Trademark by any third party, or (ii) any assertion by any third party that Dealer's use of any Trademark constitutes infringement. Company shall not be obligated to initiate or defend legal action with respect to any Trademark, and Dealer shall not initiate or defend any such action itself without Company's prior written consent; and

21.6 Dealer hereby agrees and warrants that Dealer will not incorporate all or any portion of the Trademarks into Dealer's corporate name or trade names.

**22. Force Majeure**

22.1 If the performance of Company is made impossible by reason of any circumstances beyond Company's reasonable control, including without limitation vendor delay, fire, explosion, power failure, acts of God, war, revolution, civil commotion, or acts of public enemies, any law, order, regulation, ordinance, or requirement of any government or legal body or any representative of any such government or legal body, labor unrest, including without limitation, strikes, slowdowns, picketing or boycotts, then Company shall be excused from such performance on a day-to-day basis to the extent of such interference, provided that Company shall use reasonable efforts to remove such causes of nonperformance. Under no circumstances shall economic considerations, economic impracticability or inefficiencies delay or excuse Dealer's performance or be considered an event of "Force Majeure."

**23. Termination**

23.1 Either Dealer or Company may at its option for cause forthwith terminate this Agreement hereunder by giving a thirty (30) days advance written notification to the other party, signed by the same person who originally signed the agreement (or

that person's authorized representative. If no reply is received, termination occurs anyway (if the receiving party refuses to answer or otherwise fails to reply within thirty (30) days) in accordance with section 29.

23.3 Company shall have the right to immediately terminate this Agreement without prior notice or penalty if Dealer, its employees, or agents shall materially breach this Agreement.

**24. Effect of Termination and/or Expiration**

24.1 Upon termination of this Agreement for whatever reason, Company will not be required to indemnify or pay any amount to Dealer, whether as compensation, balancing, relief or otherwise.

24.2 Upon the expiration or termination of this Agreement for whatever reason, Dealer shall promptly return to Company all Confidential Information furnished hereunder together with all copies made there from and shall not retain copies thereafter except for those necessary for the use, operation and maintenance of the Equipment by Dealer's employees or contractors.

24.3 Upon the expiration or termination of this Agreement for whatever reason, Dealer will immediately cease all use of the Trademarks and deliver to Company or destroy all materials bearing the Trademarks, including all advertising and promotional materials. Dealer shall also take all actions necessary to transfer and assign to Company or its nominee any right, title or interest in or to any of the Trademarks that Dealer may have acquired in any manner as a result of its activities under this Agreement.

24.4 Upon expiration or termination of this agreement for whatever reason Dealer enrolled accounts shall become the exclusive account of Company. All service margins and commissions from the date of termination forward shall cease to be due the Dealer.

**25. Entire Agreement**

This Agreement, the schedules hereto attached and the documents referenced herein supersede any and all prior agreements, discussions and negotiations between the Dealer and Company. They set forth the entire agreement and understandings between the parties as to the subject matter of this Agreement. Neither of the parties shall be bound by any terms, conditions, definitions, waivers, warranties or representations with respect to the subject matter of this Agreement, other than as expressly provided in this Agreement or duly set forth on or subsequent to the date hereof in a writing signed by a proper and duly authorized representative of whichever of the parties is to be bound hereby.

**26. Assignment**

This Agreement and the Dealer's obligations hereunder are un-assignable and nontransferable by the Dealer to any other party without the prior written consent of an authorized executive officer of Company. For purposes of this Section 26, any transfer of a controlling interest in Dealer shall be considered an assignment.

**27. Governing Law**

This Agreement shall be construed in accordance with the laws of the State of Ohio, except as to its provision relating to the conflicts of laws of choice of law. The parties hereto agree that the sole proper venue for any action related to this Agreement shall be State and Federal courts located in Richland County, Mansfield, Ohio, and the parties hereby irrevocably commit to the jurisdiction and venue of such courts and waive any claims of *forum non conveniens* or other causes for change of venue.

**28. Waiver**

Any failure of Company to enforce, at any time or for any period of time, any of the provisions under this Agreement shall not be construed as a waiver of the right of Company to enforce such provisions unless said waiver is in writing, and signed by an authorized executive officer of Company.

**29. Notices**

Any notice or other communications required or permitted to be given under or in connection with this Agreement shall be in writing and shall be deemed to have been duly given or made when personally delivered on the fifth (5th) day following the date it is sent, if sent by United States registered or certified mail, postage prepaid, return receipt requested, to the following addresses:

| If to Company: | If to Dealer: |
|---|---|
| President | Joey King, Owner |
| Xenios, LLC | POS Solution LLC |
| 277 Alexander Street | 25575 Metcalf |
| Suite 410 | Louisburg KS 66053 |
| Rochester, NY 14607 | |

Either party may change its address for notices hereunder by giving notice of such change in writing to the other party.

**30. Severability of Provisions**

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of this Agreement or affect those portions of this Agreement that is valid.

**31. Background, Enumeration, and Headings**

The Background, enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

### 32. Survival

Dealer recognizes and agrees that its obligations under this Agreement shall survive the termination of the Agreement, and Dealer shall be bound by such obligations after termination hereof.

### 33. Legal Relief

Both parties agree that in the event either party breaches or threatens to breach any of the covenants expressed herein, the damages to either party will be great and irreparable and default to quantify; therefore, either party may apply to a court of competent jurisdiction for injunctive or other equitable relief to restrain such breach or threat of breach, without disentitling the party from any other relief either at law or in equity. In the event that any or all of the covenants expressed herein shall be determined by a court of competent jurisdiction to be invalid or unenforceable, by reason of its geographic or temporal restrictions being too great, or by reason that the range of activities covered is too great, or for any other reason, these covenants shall be interpreted to extend over the maximum geographic area, period of time, range of activities or other restrictions to which they may be enforceable.

### 34. Terms and Conditions of License Grant

All licenses of Trademarks granted to Dealer under this Agreement or otherwise, shall be subject to and in conformance with Company's terms and conditions, and the failure to do so constitutes a material breach of this Agreement allowing Company to immediately terminate this Agreement without notice or penalty.

### 35. Merchant Services

2TouchPOS will not discuss or introduce any other Merchant Processor to Dealers clients that there is a residual interest in.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Dealer Agreement under seal, effective the date first written above.

Company:
Xenios, LLC

By: ______________________ Date

Eric W. Elwell, CEO

Dealer: (must be officer or owner)

By: ______________________ Date 10-7-10

Signature: ______________________

Printed name: Joey King

Title: Owner

## *Schedule B- Territory*

Company offers the following territorial rights to Dealer:

**1. Non-Exclusive Territory**

The following geographical regions shall be considered the Territory for purposes of this Agreement (please list counties):

Kansas Missouri
Nebraska Oklah Iowa

The foregoing definition is subject to the following exclusions:

**2. Exclusive Territory**

The following geographical regions shall be considered the Territory for purposes of this Agreement (please list counties):

Kansas Missouri

The foregoing definition is subject to the following exclusions:

| | |
|---|---|
| Company: Xenios, LLC | Dealer: Integrt POS |
| By: | By: [signature] |
| Printed Name: Eric W. Elwell | Printed Name: Joey Kim |
| Title: CEO | Title: Own.. |

## *Schedule C1- Commission Schedule – Bronze Level Dealers*

*Company offers the following commission rights to Dealer:*

a. Hardware and Software – 30% of Margin
b. Professional Services – 10% of the extended price
c. Support – 5% of extended price
d. Sales resulting from Xenios Farming efforts:
    i. Hardware and Software – 5% of Margin
    ii. Professional Services – 2.5% of Extended Price
    iii. Support – 1% of Extended Price

*The foregoing definition is subject to the following exclusions:*

a. Trade discount reduces the amount of the commissionable sale
b. 5% commission reduction for invoices 30 days past due
c. Commission Splits with other sales reps are on a case by case basis

*Commissions Due for Sales with scheduled payments (in House financing):*

a. Commissions on sales with scheduled payments (in house financing) will be paid of the same term of the schedule to the customer within 20 days of collection of the installment from the customer

*Non Commissionable Items:*

Major Version Upgrades
Hourly Support Billings
Supplies
Hard Drives and Memory Upgrades
Freight
Misc Charges
Expenses
Travel

Company: Xenios, LLC
By:______________________

Printed Name: Eric W. Elwell
Title: CEO

Dealer: ______________________
By: ______________________

Printed Name: ______________________
Title: ______________________

## *Schedule C2- Commission Schedule – Silver Level Dealers*

*Company offers the following commission rights to Dealer:*

a. Hardware and Software – 30% of Margin (if sold by Company)
b. Support – 5% of extended price
c. Sales resulting from Xenios Farming efforts:
    1. Hardware and Software – 5% of Margin
    2. Professional Services – 2.5% of Extended Price
    3. Support – 1% of Extended Price

*The foregoing definition is subject to the following exclusions:*

a. Trade discount reduces the amount of the commissionable sale
b. 5% commission reduction for invoices 30 days past due
c. Commission Splits with other sales reps are on a case by case basis

*Commissions Due for Sales with scheduled payments (in House financing):*

a. Commissions on sales with scheduled payments (in house financing) will be paid of the same term of the schedule to the customer within 20 days of collection of the installment from the customer

*Non Commissionable Items:*

Major Version Upgrades
Hourly Support Billings
Supplies
Hard Drives and Memory Upgrades
Freight
Misc Charges
Expenses
Travel

Company: Xenios, LLC
By:____________________

Printed Name: Eric W. Elwell
Title: CEO

Dealer: ____________________
By: ____________________

Printed Name: ____________________
Title: ____________________

## *Schedule C3- Commission Schedule – Gold Level Dealers*

*Company offers the following commission rights to Dealer:*

a. Support – 5% of extended price (if selling Company support)

*The foregoing definition is subject to the following exclusions:*

a. Trade discount reduces the amount of the commissionable sale
b. 5% commission reduction for invoices 30 days past due
c. Commission Splits with other sales reps are on a case by case basis

*Commissions Due for Sales with scheduled payments (in House financing):*

a. Commissions on sales with scheduled payments (in house financing) will be paid of the same term of the schedule to the customer within 20 days of collection of the installment from the customer

*Non Commissionable Items:*

Major Version Upgrades
Hourly Support Billings
Supplies
Hard Drives and Memory Upgrades
Freight
Misc Charges
Expenses
Travel

Company: Xenios, LLC
By: [signature]
Printed Name: Eric W. Elwell
Title: CEO

Dealer: Integrity POS
By: Joey King
Printed Name: Joey King
Title: Owner

*Schedule D- Dealer Status*

| Dealer | Bronze | Silver | Gold |
|---|---|---|---|
| **Core Differentiators** | | | |
| Provide Call Center | No | No | Can |
| Purchase Hardware | No | Can | Yes |
| Production Build | No | Yes | Yes |
| Install, Train, Go Live | No | Yes | Yes |
| Registration Codes | No | Limited to 1 yr | Yes |
| Login Codes | No | Yes | Yes |
| **Requirements** | | | |
| Certified Technician | No | No | Yes |
| Tier2 Fee | No | No | Yes |
| Existing POS Clients | 0 | 5 | 25 |
| **Impacts** | | | |
| Xenios Farms Accounts | Yes | Yes | Yes |

The foregoing definition is subject to the following exclusions:

Company: Xenios, LLC
By: [signature]
Printed Name: Eric W. Elwell
Title: CEO

Dealer: Integ POS
By: [signature]
Printed Name: Joey King
Title: Owner

*Schedule E- Dealer Price List*

**2TouchPOS Dealer Pricing**

| Item # | Description | Dealer | Suggested Retail |
|---|---|---|---|
| W001 | **2TouchPOS** License 1st and 2nd | $500 EA | $1100 EA |
| | **2TouchPOS** License 3rd and 4th | $475 EA | $1100 EA |
| | **2TouchPOS** License 5th to 7th | $450 EA | $1100 EA |

| | | | |
|---|---|---|---|
| | **2TouchPOS** License 8th to 9th | $400 EA | $1100 EA |
| | **2TouchPOS** License 10th | $350 EA | $1100 EA |
| BOF001 | **2TouchPOS** Back Office License | $295 EA | $600 EA |
| CAM001 | **2TouchPOS** Camera Integration License | $495 EA | $795 EA |
| CCW004 | **2TouchPOS** Credit Card License | $295.00 | $695.00 |
| SRV001 | **2TouchPOS** Server License (Database Only) | $195 EA | $395 EA |
| KVD001 | **2TouchPOS** Kitchen Video Display License | $395 EA | $695 EA |
| LM001 | **2TouchPOS** Liquor Monitor Integration | $295 EA | $495.00 |
| SCA001 | **2TouchPOS** Door Monitor License | $295.00 | $495 EA |
| UPG001 | **2TouchPOS** Major Version Upgrade | $250.00 | $495.00 |
| SSC001 | **2TouchPOS** Tier1 software Support Only | | Dealer Choice |
| | 1st License | $49.95 | $59.95 |
| | Ea. Additional license | $10.00 | $15.00 |
| SSC002 | **2TouchPOS** Tier2 software Support Only | | N/A |
| | Monthly Per Site | $25.00 | |
| | Annual Per Site | $275.00 | |
| GCL001 | **2TouchPOS** Gift & Loyalty Card Codes | | |
| | 100-1000 Codes | $0.10 EA | 100 Min Order |
| | 1000+ Codes | | Call for pricing |
| | | | |

## 2TouchPOS Dealer Pricing - Services

### On-Line Training

| | |
|---|---|
| Advanced On-Line System Training (4 hours) | $420.00 |
| Train the Trainer (4 hours) | $420.00 |
| Menu Configuration and Programming | $68.00 \ Hr |

### Technical Training

| | |
|---|---|
| Dealer Site (1 1/2 Days Required For First Install) | $1350.00 |
| - Dealer is responsible for all associated Travel Expenses | |

### Additional Training

| | |
|---|---|
| Optional Customer Training For First Install | $900 per day |
| - One day recommended | |
| Additional on site sales and technical training available | $900 per day |

| | |
|---|---|
| On Line training | $105 per hour |
| Technical training | $600/day— Mansfield, OH |
| | $900/day— Dealer site |
| - Dealer is responsible for all associated Travel Expenses | |

| | |
|---|---|
| **Annual Dealer Fee** | $995 |

I